IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

LEUNDRELL LENOIR                                                                                      PLAINTIFF

V.                                                                        CIVIL ACTION NO. 1:16-CV-58-SA-DAS

SGS NORTH AMERICA, INC.                                                                           DEFENDANT

MEMORANDUM OPINION

Leundrell Lenoir filed his Complaint [1] in this Court on April 13, 2016[1] alleging that his former employer, SGS North America, Inc., racially discriminated against him in his employment and violated his rights protected by the Family Medical Leave Act.[2] Now before the Court is SGS's Motion for Summary Judgment [40] on all of Lenoir's claims. The issues are fully briefed and ripe for review. *See* [43, 45].

*Factual and Procedural Background*

Factual controversies are resolved in favor of the Plaintiff when both parties submitted evidence of contradictory facts. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Lenoir, an African American male, started working for SGS as a switchman in July 2013. SGS is a contractor for the Axiall chemical plant in Aberdeen, Mississippi. SGS is primarily responsible for moving rail cars in and out of the plant, and sorting and pulling out select rail cars as needed. As a switchman, Lenoir worked on a three-person team along with a locomotive engineer and a lead man. SGS ran two of these three-person teams at the Aberdeen Axiall plant. Soon after being hired, SGS also trained Lenoir as a locomotive engineer. By all accounts,

---

[1] Lenoir filed an Amended Complaint [23] on November 8, 2016.
[2] The Plaintiff originally alleged an additional claim for disability discrimination under the Americans with Disabilities Act. The Plaintiff withdrew this claim in his summary judgment brief.

Lenoir was a good employee with a clean work record at SGS.[3] John Jackson was the Site Supervisor who oversaw SGS operations at the Axial plant on a day to day basis. Brice Dorgan was the Operations Manager over several SGS sites, and was on the Aberdeen site a few days each month.

In the fall of 2014, fellow SGS employee Landry Hill trained Lenoir to take his place as a rail car inspector. Hill trained Lenoir for a couple of weeks before he left SGS. As an inspector, Lenoir was responsible for checking the brake shoes, tie wheels, hoses, and many other parts of the rail cars. Lenoir was also responsible for filling out and filing the associated inspection forms and documents. In March of 2015, SGS moved Will Curry over to inspector along with Lenoir. The idea was that Lenoir and Curry would work together to perform all the inspections as a team, a second inspector was needed due to the workload, and that Curry would cover for Lenoir when he went out for a planned double hernia surgery. Lenoir trained Curry, and got him up to speed on the job by the time Lenoir went on leave for surgery in April 2015.

On April 9, 2015, Lenoir had surgery to repair the double hernia. SGS approved Lenoir for leave under the Family Medical Leave Act, and Lenoir filed all the necessary paperwork with Human Resources. On May 19, 2015, Lenoir's doctor gave him approval to return to work on light-duty with a lifting restriction of 20 pounds. Lenoir wanted to return to work, and believed he could perform his inspection duties with the restriction, but Site Supervisor Jackson told Lenoir that he could not return to work until he was cleared with zero restrictions. While out on leave, Lenoir's co-worker, Cummings, informed him that SGS was planning to replace him with a former employee that wanted to come back, J.J. Mooneyham, a white male.

---

[3] The team Lenoir worked on was written up for one incident where a rail car was pushed past a "fault line" where it should not have been. SGS attributed this infraction to the whole team, not to Lenoir personally. Lenoir was driving the locomotive and the other team members were watching to tell him when to stop but failed to do so in time because their radio went out. SGS did not take any disciplinary action relative to this incident.

Lenoir's doctor cleared him to return to work with no restrictions on May 29, 2015. Lenoir returned to work the following Monday, June 1, 2015. According to Lenoir, Jackson's attitude towards him changed dramatically for the worse when he returned to work after his surgery. Upon his return to work, Jackson informed Lenoir that if he could not do the job, he would be replaced by Mooneyham. Also on June 1, 2015, SGS took on a new contract to make some repairs to the rail cars such as changing brake shoes, replacing hoses, and various clips, hangars, etc. The inspectors, Lenoir and Curry, were responsible for making these repairs in addition to their inspection duties. Although the extent and timing is not clear, Lenoir had at least some experience and training, possibly from Hill, on how to perform these repairs.

On Monday June 8, 2015, Lenoir and Curry were in Jackson's office sitting across the desk from him. Jackson had a length of rope leftover from a safety training exercise. According to Lenoir and Curry, Jackson tied the rope into a noose and held it up in front of Curry and Lenoir. Jackson then leaned back in his chair and made a "popping" noise with his mouth. Lenoir was greatly distressed and told Jackson "I don't play like that, you don't do that to a black man" and left the office. Lenoir and Curry discussed the incident. Lenoir was afraid to report the incident because he was already afraid of losing his job to Mooneyham. Although he was informed that SGS had an official harassment policy when hired, Lenoir did not remember the policy and did not report the incident to the human resources department in Louisiana.[4] In his deposition, Jackson admitted to knowing the offensive symbolism of the noose, especially to African Americans in the South, but denied tying the noose. Lenoir did his best to avoid Jackson for the next few days.

---

[4] SGS has no human resources presence at the Aberdeen Axial site, and no management presence aside from Jackson, and occasionally Dorgan.

On Wednesday June 10, 2015, Operations Manager Dorgan arrived at the Aberdeen Axial site for his monthly visit. While Lenoir was taking a break in the scale house, Dorgan and Jackson approached the scale house and observed Lenoir leaning back in his chair with his sunglasses on. Dorgan and Jackson accused Lenoir of sleeping when he was supposed to be working. Dorgan and Jackson gave Lenoir a disciplinary write up for the incident. According to Lenoir, he was not asleep, he was only in the scale house for 15 or 20 minutes, employees often took their breaks in the scale house, and it was normal for inspectors to take lengthy breaks sometimes depending on their workload.

On Thursday June 11, 2015, Dorgan was again on site. Dorgan and Jackson performed an audit on some of the cars Lenoir and Curry inspected and repaired the previous week. According to Dorgan and Jackson, four of the repairs Lenoir and Curry claimed to have made were not performed or were not done properly. Lenoir disputes their finding, but admits that he missed a strap on one hose. Dorgan and Jackson fired Lenoir the following day for falsifying documentation, specifically, for reporting repairs as complete that were not. SGS hired Mooneyham to replace Lenoir in the inspector position.

After filing a charge with the Equal Employment Opportunity Commission and receiving a right-to-sue letter, Lenoir filed this suit. In his Amended Complaint [23], Lenoir alleges that SGS harassed, discriminated, and retaliated against him based on his race, and retaliated against him for taking FMLA leave. SGS now requests summary judgment in its favor on all of Lenoir's claims.

*Standard of Review*

Federal Rule of Civil Procedure 56 governs summary judgment. Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the

moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323, 106 S. Ct. 2548. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324, 106 S. Ct. 2548 (citation omitted). In reviewing the evidence, factual controversies are to be resolved in favor of the non-movant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075. When such contradictory facts exist, the Court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

Lenoir asserts three race discrimination claims under Title VII and 42 U.S.C. § 1981, and one claim under the FMLA. Lenoir's race claims are (1) that his termination was racially discriminatory, (2) that he was terminated in retaliation for engaging in an activity protected by Title VII, and (3) that his work environment was racially hostile. Lenoir's final claim is that he was terminated in retaliation for taking FMLA leave.

*Race Discrimination – Termination*

To succeed on a claim for racial discrimination under Title VII or 42 U.S.C. § 1981, a plaintiff must first prove a *prima facie* case either through direct evidence of discriminatory

5

motive, or circumstantial evidence under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Lee v. Conecuh Cty. Bd. of Ed.*, 634 F.2d 959, 961–62 (5th Cir. 1981); *Mason v. United Air Lines, Inc.*, 274 F.3d 314, 318 (5th Cir. 2001).

Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption. *Harry v. Dallas Hous. Auth.*, 662 F. App'x 263, 266 (5th Cir. 2016) (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). In the Title VII context, direct evidence includes any statement or document that shows on its face that an improper criterion served as a basis for the adverse employment action. *Id*.

To establish a prima facie case of discrimination using circumstantial evidence under the *McDonnell Douglas* framework, a plaintiff must show that he (1) was a member of a protected group; (2) was qualified for his position; (3) suffered an adverse employment action; and (4) was replaced by someone outside of his protected group. *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. 1817; *Giles v. City of Dallas*, 539 F. App'x 537, 543 (5th Cir. 2013); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).

If a plaintiff establishes a presumption of discrimination by establishing a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Reeves*, 530 U.S. at 142, 120 S. Ct. 2097; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). The burden on the employer "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves*, 530 U.S. at 142, 120 S. Ct. 2097 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

If the employer sustains its burden, the *prima facie* case is dissolved, and the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic. *Alvarado v. Texas Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

SGS concedes that Lenoir has established a *prima facie* case and asserts that it fired Lenoir for a legitimate non-discriminatory reason, falsifying documents. Thus, the inquiry now before the Court is whether Lenoir has brought forth sufficient evidence to demonstrate a genuine issue of material fact as to pretext or motivating factor.

SGS asserts that it fired Lenoir for documenting repairs as complete that were not actually performed. Lenoir responds that he did perform the repairs and that SGS was just looking for a way to get rid of him. Dorgan and Jackson performed an audit on six rail cars that Curry and Lenoir inspected and repaired the previous week. According to Dorgan and Jackson, four of the cars had issues that Lenoir and Curry documented as complete but did not repair.

As evidence of pretext, Lenoir argues that he did perform the repairs, points out that SGS never conducted an audit of rail cars before, and did not conduct another one until November of 2016, nearly a year and a half later. According to SGS there are between 300 and 500 rail cars on the premises at any given time, but Dorgan and Jackson only inspected six.

As to the results of the audit, Dorgan and Jackson cited three of the four problem rail cars as not having new brake shoes even though Lenoir and Curry documented them as replaced. When questioned, Lenoir explained that they often replaced worn out brake shoes with used shoes that still had a lot of pad wear left. Lenoir also explained that even new shoes that they

7

installed appeared rusty because they had surface rust on them from being stored outdoors. According to Lenoir, SGS trained him to perform brake shoe repairs in this manner, and he performed the brake shoe repairs on these three cars. The other two rail cars cited in the audit had issues with their hose straps. Again, Dorgan and Jackson cited these rail cars as having old hose straps that Lenoir and Curry claimed to have replaced. Lenoir admits that he missed a hose strap on one end, but argues that he did replace the other straps, again with straps in better condition that may have been weathered. Notably, Dorgan and Jackson's only documentation of the audit results is a typewritten chart prepared by Jackson, there are no photographs or other official documentation, and it is unclear when this chart was prepared.

In addition to challenging the validity of the audit, Lenoir argues that Jackson's threat to replace him with Mooneyham, a white person, followed by his actual replacement with Mooneyham is additional evidence of pretext. Finally, Lenoir argues that the incident where Jackson tied and brandished a noose in front of him, allegedly to intimidate him, is evidence that Jackson harbored racial animus towards him and that race was a motivating factor in the decision to fire him.

The Court finds numerous issues of material fact as to Lenoir's race discrimination-termination claim. There is a question of fact as to whether Lenoir and Curry performed the repairs, and the whether the audit is flawed fundamentally. In addition, there are questions of fact as to the audit's reliability and results that would require the Court to engage in fact and credibility weighing, inappropriate at this summary judgment stage. In addition, the Court finds Jackson's threats to replace Lenoir with Mooneyham, and the racial animus implied in Jackson's noose tying deeply troubling. These factual allegations are integral to the determination of the claim, and warrant jury consideration of the various, divergent versions of events.

Because there are questions of fact as to whether SGS's proffered reason for terminating Lenoir is true, and whether race was a motivating factor in his termination, SGS's motion for summary judgment on Lenoir's race discrimination-termination claim is denied.

*Race – Retaliation*

Lenoir's second race related claim is for retaliation based on his response to Jackson's noose tying. Specifically, Lenoir claims that Jackson terminated him in retaliation for his comment "I don't play like that, you don't do that to a black man" and leaving the office making it clear to Jackson that he was offended and did not approve.

Similar to his race discrimination claim, Lenoir must navigate the familiar *McDonnell Douglas* burden-shifting framework to establish his retaliation claim through circumstantial evidence. *Smith v. Bd. of Supervisors of S. Univ.*, 656 F. App'x 30, 32 (5th Cir. 2016) (citing *Long v. Eastfield Coll.*, 88 F.3d 300, 304–05 (5th Cir. 1996)). To establish his *prima facie* case, Lenoir must show that (1) the [he] engaged in activity protected by Title VII; (2) [SGS] took adverse employment action against [him]; and (3) a causal connection exists between that protected activity and the adverse employment action. *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 757 (5th Cir. 2017), *as revised* (Mar. 30, 2017) (citing *Zamora v. City Of Houston*, 798 F.3d 326, 335 (5th Cir. 2015), *cert. denied sub nom., City of Houston, Tex. v. Zamora*, 136 S. Ct. 2009, 195 L. Ed. 2d 215 (2016); *Thomas v. Tex. Dep't of Criminal Justice*, 220 F.3d 389, 394 (5th Cir. 2000)).

If Lenoir establishes a *prima facie* case, the burden shifts to SGS to introduce evidence of a legitimate, non-retaliatory reason for the adverse employment action. *Smith*, 656 F. App'x at 32 (citing *Long*, 88 F.3d at 304; *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007)). If SGS meets its burden, Lenoir "then bears the ultimate burden of proving that the employer's

proffered reason is not true but instead is a pretext for the real . . . retaliatory purpose." *Id*. Importantly, and distinguished from his race discrimination claim discussed above, ultimately Lenoir must show "that his [. . .] protected activity was a but-for cause of the alleged adverse action by [SGS]." *Fisher*, 847 F.3d at 757 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ––– U.S. –––, 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (2013)).

SGS's primary argument against Lenoir's race-retaliation claim is that Lenoir cannot establish the requisite causal link for his *prima facie* case. Specifically, SGS argues that Dorgan was the ultimate decision maker in Lenoir's termination and that Dorgan had no knowledge of the noose incident, or of Lenoir's complaint.

There is a disputed question of fact as to Jackson's ultimate role in the decision to terminate Lenoir. Despite SGS's argument to the contrary, in his deposition Jackson states the decision to fire Lenoir was a "joint decision" between him and Dorgan. Construing this disputed fact in Lenoir's favor, coupled with the close temporal proximity, three days, between the noose incident and the rail car audit, the Court finds that a reasonable jury could find the requisite causal connection sufficient to establish Lenoir's *prima facie* case. *See Zamora*, 798 F.3d at 335 (noting that Courts have found that to establish a *prima facie* case, plaintiffs may rely solely on temporal proximity between protected activity and an adverse employment action only if the two are very close.) (citing, *e.g., Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)). In addition to the temporal proximity, the Court notes the above discussed pretext evidence.

Although the but-for causation standard that Lenoir must meet is higher for his retaliation claim than the burden required to prove his race discrimination claim, the intertwined issues of disputed material facts preclude summary judgment. In short, the Court finds that, viewing the

evidence as a whole and in the light most favorable to Lenoir, a reasonable jury could find the requisite casual connection between Lenoir's protected activity and his termination, and that Lenoir's complaint about the noose tying was the but-for cause for his termination. *See Stennett v. Tupelo Pub. Sch. Dist.*, 619 F. App'x 310, 323–24 (5th Cir. 2015); *Nassar*, 133 S. Ct. at 2534; s*ee also Houston v. Mississippi Dep't of Human Servs.*, 131 F. Supp. 3d 598, 605 (S.D. Miss. 2015) (citing *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012); *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

For these reasons, SGS's motion for summary judgment as to Lenoir's race-retaliation claim is denied.

*Race – Harassment*

Lenoir's third and final race related claim is for race-based workplace harassment. Lenoir alleges that Jackson's actions created a hostile work environment.[5] A plaintiff may establish a Title VII violation based on race discrimination creating a hostile work environment by showing:

> (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (citing *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001); *Jones v. Flagship Int'l*, 793 F.2d 714, 719-720 (5th Cir. 1986)). "For harassment on the basis of race to affect a term, condition, or privilege of employment, as required to support a hostile work environment claim under Title VII, it must be

---

[5] Lenoir also asserts a harassment claim based on *quid-pro-quo* harassment. Black's Law Dictionary defines "quid pro quo" as "[Latin 'something for something'] An action or thing that is exchanged for another action or thing of more or less equal value; a substitute <the discount was given as a quid pro quo for the extra business>. Black's Law Dictionary (10th ed. 2014). Lenoir has not alleged any facts that could support a theoretical *quid-pro-quo* race harassment claim, the Court is not aware of any cases recognizing such a claim, nor has Lenoir brought forth any precedent recognizing such a claim. For these reasons, the Court is unwilling to extend the existing race-harassment doctrine and recognize a theory for recovery based on *quid-pro-quo*.

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) (internal quotations omitted)).

Courts must consider the following circumstances in determining whether a workplace constitutes a hostile work environment: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ramsey*, 286 F.3d at 268 (citing *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000); *Harris*, 510 U.S. at 23, 114 S. Ct. 367). "No single factor is determinative." *E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 399 (5th Cir. 2007).

"Under the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim as well as a continuous pattern of much less severe incidents of harassment." *Carr v. Sanderson Farms, Inc.*, 665 F. App'x 335, 340 (5th Cir. 2016); *WC&M Enterprises*, 496 F.3d at 400 (collecting cases) (quoting, *i.e.*, *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005) ("The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct")).

SGS concedes the first three prongs of Lenoir's harassment claim, but argues that the single noose incident was not sufficiently severe or pervasive to create a hostile work environment. SGS also asserts the *Faragher/Ellerth* affirmative defense, arguing that it had an anti-discrimination policy in place and that Lenoir failed to reasonably take advantage of the corrective opportunities provided by the policy. *See Faragher v. City of Boca Raton*, 524 U.S.

775, 780, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 747, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

In support of its argument, SGS cites to several other cases involving nooses. SGS argues that in these cases, Courts declined to find the alleged harassment, exposure to a single noose, sufficiently severe or pervasive. *See Leslie v. Noble Drilling (U.S.) L.L.C.*, No. CV H-16-0610, 2017 WL 1051131 (S.D. Tex. Mar. 17, 2017); *Brooks v. Firestone Polymers, LLC*, 70 F. Supp. 3d 816 (E.D. Tex. 2014), *aff'd sub nom. Brooks v. Firestone Polymers, L.L.C.*, 640 F. App'x 393 (5th Cir. 2016); *Filer v. Donley*, No. 4:10-CV-310-A, 2011 WL 196169 (N.D. Tex. Jan. 20, 2011), *rev'd on other grounds*, 690 F.3d 643 (5th Cir. 2012); *Jimerson v. Garrett Aviation Servs., LLC*, No. H-09-0790, 2010 WL 5067692 (S.D. Tex. Dec. 6, 2010).

Although the Courts in these cases did decline to find a hostile work environment based on single incidents, SGS's reliance on these cases is misplaced, as they are easily distinguished from the instant case. In *Leslie*, a plaintiff's coworker on a drill ship showed him a noose and the plaintiff told the coworker it was offensive. The coworker untied the noose and walked away. The plaintiff complained to his employer, the employer gave the plaintiff paid leave, reprimanded the coworker, and reassigned the plaintiff to another ship.

The plaintiff in *Brooks* found a miniature noose in his hardhat on top of his locker. The plaintiff did not know who put the noose there and never told any of his coworkers or supervisors about it.

In *Filer* the plaintiff observed a noose and hand grenade on his supervisor's desk on a stand labeled "complaint department" while in the supervisor's office chatting with a coworker. After their conversation, the coworker let the supervisor know that the plaintiff saw the noose, and was planning to come and talk with the supervisor about it. The supervisor immediately

threw the display in the garbage, and let the plaintiff know that he disposed of it when the plaintiff returned later that day to discuss the matter.

In *Jimerson*, the plaintiff was standing around an airplane hangar with his coworkers and after noticing a length of rope hanging from the rafters asked, "What the hell is this rope for?" One of the plaintiff's coworkers replied that it was for the plaintiff to wrap around his neck.

In the instant case, Jackson threatened to replace Lenoir with a white person, Mooneyham, on several occasions. Jackson even talked with Lenoir's coworkers about bringing Mooneyham back to replace Lenoir, while Lenoir was still out on leave. While seated across the desk from Lenoir and Curry in his office, Jackson tied a rope into a noose and held it up in front of them. Lenoir claims that he was in a state of disbelief, upset, and angry after the noose incident. Lenoir did his best to avoid Jackson after this and he remained upset about the incident all week and discussed it with Curry several times. A few days later, Jackson initiated the first ever audit of Lenoir and Curry's work, and the next day, fired him. Although Jackson denies tying the noose, he admits to knowing the significance of the noose as a symbol.

Looking at the totality of the circumstances in the instant case, the Court finds that a reasonable jury could find that the harassment was sufficiently severe to create a hostile work environment. Unlike the cases cited by SGS, Jackson's noose tying was clearly directed at Lenoir and Curry and was done within the larger context of the threat of termination and replacement. Jackson was Lenoir's direct supervisor and the only managerial employee on-site. Also unlike the cases cited by SGS, Lenoir has brought forth evidence that the incident interfered with his performance, he was nervous and upset, felt he had to avoid Jackson, and he was scared to go to Dorgan and complain because he was already afraid of losing his job. Further distinguishing the instant case, when Lenoir complained to Jackson, instead of taking corrective

action to remedy the offense, Jackson arguably elevated his efforts to intimidate and terminate Lenoir. Considering all the relevant factors, the Court finds that although the harassment in this case was not frequent, it was severe, could be considered physically threatening, was clearly humiliating, was not merely an offensive utterance given the larger context, and interfered to at least a certain extent with Lenoir's performance. *Ramsey*, 286 F.3d at 268 *Walker*, 214 F.3d at 625; *Harris*, 510 U.S. at 23, 114 S. Ct. 367; *WC&M Enterprises*, 496 F.3d at 399 (stating, "No single factor is determinative").

Turning then to SGS's asserted affirmative defense, the Court notes that "Normally an employer is strictly liable for a supervisor's harassment of an individual whom he or she supervises." *Pullen v. Caddo Par. Sch. Bd.*, 830 F.3d 205, 209 (5th Cir. 2016) (quoting *Vance v. Ball State Univ.*, ––– U.S. ––––, 133 S. Ct. 2434, 2439, 2442, 186 L. Ed. 2d 565 (2013)). "The *Ellerth/Faragher* affirmative defense is an exception and is available to employers where a plaintiff alleges [. . .] harassment by a supervisor but does not claim that the harassment resulted in a tangible employment action." *Id*. The employer has the burden of proving both elements of the defense by a preponderance of the evidence. *Id*. (citing *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 462 (5th Cir. 2013). "First, the employer must show that it exercised reasonable care to prevent and correct sexual harassment. Second, it must establish that the employee unreasonably failed to take advantage of preventive or remedial opportunities provided by the employer." *Pullen*, 830 F.3d at 209–10 (citing *Boh Bros.*, 731 F.3d at 462; *Watts v. Kroger Co.*, 170 F.3d 505, 509–10 (5th Cir. 1999) (quoting *Faragher*, 524 U.S. at 807, 118 S. Ct. 2275) (internal quotation marks omitted).

In this case, the parties agree that SGS had a harassment policy in place satisfying the first element of the defense. As to the second element, Lenoir argues that he was afraid to go to

Dorgan because he was already afraid of losing his job. Because Jackson was the top SGS employee at the Aberdeen Site and Dorgan was only there occasionally, Lenoir had limited access to SGS management. SGS argues that Lenoir could have contacted human resources, that he had some contact with them regarding his medical leave, and that he unreasonably failed to do so. In his deposition, Lenoir agreed that he was probably informed about SGS's harassment policy when he was hired but that he did not remember it. The Court finds that whether Lenoir unreasonably failed to take advantage of SGS's harassment policy involves questions of fact best suited for jury consideration.

Because Lenoir has raised genuine issues of material facts as to the alleged harassment and as to SGS's asserted affirmative defense, SGS's motion for summary judgment is denied as to Lenoir's race-harassment, hostile work environment claim.

*Family Medical Leave Act – Retaliation*

Lenoir's final claim is that he was fired in retaliation for taking approved medical leave, in violation of the Family Medical Leave Act. Like Title VII retaliation claims, FMLA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *Wheat v. Florida Par. Juvenile Justice Comm'n*, 811 F.3d 702, 705–06 (5th Cir. 2016) (citing *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir. 1999); *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001)). "That framework requires the employee first to set out a *prima facie* case of retaliation, which he may do by establishing that: (1) he engaged in protected activity; (2) the employer took a materially adverse action against him; and (3) a causal link exists between his protected activity and the adverse action. *Wheat*, 811 F.3d at 705–06 (citing *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 489–90 (5th Cir. 2014) (Title VII), *cert. denied*, ––– U.S. –––, 135 S. Ct. 2804, 192 L. Ed. 2d 847 (2015); *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 390 (5th Cir. 2013)

(FMLA)). When a plaintiff sets out a *prima facie* case under *McDonnell Douglas*, "the burden shifts to the employer to state a legitimate, non-retaliatory reason for the adverse action." *Wheat*, 811 F.3d at 710; *Davis*, 765 F.3d at 490.

It remains undecided in this Circuit whether the "but-for" causation standard that applies in Title VII retaliation claims also applies in FMLA retaliation claims. *See Fisher*, 847 F.3d at 757 (citing *Nassar*, 133 S. Ct. at 2534). Although it is "unclear whether the 'causal link' requirement for FMLA retaliation claims involves the same 'but for' analysis required for Title VII retaliation claims." It is clear that a plaintiff "may avoid summary judgment on but for causation by demonstrating a conflict in substantial evidence on this ultimate issue." *See Wheat*, 811 F.3d at 705, 710 (discussing the potential implications of *Nassar* on FMLA retaliation claims); *see also Nassar*, 133 S. Ct. 2517; *Hernandez v. Yellow Transp., Inc.*, 670 F. 3d 644, 660 (5th Cir. 2012) ("Evidence is 'substantial' if it is of such quality and weight that reasonable and fair-minded [people] in the exercise of impartial judgment might reach different conclusions.") (internal citation omitted)).

Lenoir relies primarily on the close temporal proximity between his FMLA leave and his termination as proof of his claim. Lenoir also relies on Jackson's refusal to allow him to return on light-duty, Jackson's threats to replace him, and some comments by Jackson about the length of his leave, i.e. "took your ass long enough".

There are a number of similarities between Lenoir's Title VII-retaliation claim and his FMLA-retaliation claim, and many common facts and issues relevant to both claims. Given the numerous disputed material facts, especially with regard to pretext, fully discussed above, the Court finds that these genuine issues of material fact preclude a summary judgment determination on Lenoir's FMLA-retaliation claim as well.

17

When reviewing a motion for summary judgment as to pretext, the Court, viewing the evidence "as a whole and in the light most favorable to [the Plaintiff]" "must determine whether a rational jury *could*—not probably would—conclude that the employer's proffered non-discriminatory hiring rationale is pretextual." *Stennett*, 619 F. App'x at 323–24. The Court finds that Lenoir has made such a showing. The Court also notes, "[e]ven if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'" *Houston*, 131 F. Supp. 3d at 605 (quoting *Firman*, 684 F.3d at 538 (citing *Liberty Lobby*, 477 U.S. at 255, 106 S. Ct. 2505). The Court finds that in this case the most prudent course is to proceed to a full trial. For all these reasons, SGS's motion for summary judgment is denied as to Lenoir's FMLA-retaliation claim.

*Conclusion*

For all of the reasons fully explained above the Defendant, SGS's Motion for Summary Judgment [40] is GRANTED in part, and DENIED in part. Plaintiff Lenoir's Americans with Disabilities Act claim is WITHDRAWN. Defendant SGS's Motion for Summary Judgment [40] as to Plaintiff Lenoir's claim for race-harassment based on *quid-pro-quo* is GRANTED, and this claim is DISMISSED with prejudice. Defendant SGS's Motions for Summary Judgment [40] as to all of Plaintiff Lenoir's other claims is DENIED.

So ORDERED on this the 18th day of September, 2017.

    /s/ Sharion Aycock  
    UNITED STATES DISTRICT JUDGE